**FILED**
**CLERK**

JGK  03/20/2017
**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

.
Barbara Winslow,                      .  Docket #CV-15-2996 (AYS)
                                      .
      Plaintiff,                      .
                                      .  United States Courthouse
     vs.                             .  Central Islip, New York
                                      .  January 11, 2017
Forster & Garbus, LLP,                .  2:10 p.m.
et al.,                               .
                                      .
      Defendants.                     .
..........................................................

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For The Plaintiff:          Daniel A. Schlanger, Esq.
                            Kakalec & Schlanger, LLP
                            85 Broad Street-18th Fl.
                            New York, NY 10004

For The Defendants:         Glenn M. Fjermedal, Esq.
                            Davidson Fink, LLP
                            28 East Main St.-Ste. 1700
                            Rochester, NY 14614

Audio Operator:

Transcribing Firm:          Writer's Cramp, Inc.
                            63 Dakota Drive
                            Hamilton, NJ 08619
                            609-588-8043

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

```
 1              THE CLERK:  Calling civil case 2015-2996, Winslow
 2   vs. Forster & Garbus.  Counsel state your appearances, please.
 3              MR. SCHLANGER:  Yes, Dan Schlanger of Kakalec &
 4   Schlanger for the plaintiff.
 5              MR. FJERMEDAL:  Good afternoon, Glenn Fjermedal for
 6   Davison Fink for defendants.
 7              THE COURT:  Okay.  So, tell me what happens here,
 8   like, what --
 9              MR. SCHLANGER:  Your Honor --
10              MR. FJERMEDAL:  (Indiscern.).  Do you mind if I just
11   grab that for a moment?
12              THE COURT: Go ahead.  Sure, yes.  Is this student
13   loan debt?
14              Mr. SCHLANGER:  Yes.
15              THE COURT:  Okay.  Talk to me.
16              MR. SCHLANGER:  Sure. So, Your Honor, questions
17   where we are right now, so --
18              THE COURT:  Yeah.  Could you allege that what --
19              MR. SCHLANGER:  We allege that defendants violated
20   the ethics of P.A. in three separate notices.  These are
21   boilerplate state court pleadings, so we don't believe there's
22   any issue about an individual nature of an inquiry in your --
23   or, you know, commonality or anything like that in the class
24   cert.  We know that the substance of the violations are as
25   follows:  One is that the state court pleadings allege that
```

1   the National Collegiate Trust is authorized to pursue in state
2   court and, we believe that as a matter of law, they are not.
3   And that's because they are a foreign trust and under New York
4   laws, specifically, the general assembly -- General
5   Association Law, foreign trusts are required to register --
6           THE COURT:  They're a foreign trust?
7           Mr. SCHLANGER:  Sure.
8           THE COURT:  The National Collegiate Student Loan
9   Trust is a --
10          MR. FJERMEDAL:  They're a Delaware --
11          MR. SCHLANGER:  They're a Delaware trust.
12          THE COURT: Okay.
13          MR. SCHLANGER:  So that requires them to, prior to
14  filing suits in Newark, to register with New York State and
15  they didn't do it.
16          THE COURT:  Okay.  Is that right?
17          MR. FJERMEDAL:  That is correct, but it's our -- its
18  my client's position or NCSLT's position that they do not need
19  to be -- or are not required to be registered in New York, so
20  we have a very yes/no, kind of --
21          THE COURT:  But, we're -- so, I mean, but that would
22  seem to me to be something that would be black and white, it's
23  either it says somewhere they have to register or it doesn't.
24          MR. SCHLANGER:  So, I think that's right.  I mean, I
25  think it's a discreet legal issue and that, you know, I

1    suppose, particularly, the argument defendant is making is in
2    particular (indiscern.) which as I understand, the argument is
3    that the requirement to register only applies to corporations
4    and the foreign trust isn't a corporation.  They're relying on
5    the business corporation law, we think that the general
6    assembly law clearly governs this.  It defines -- it says it
7    applies to associations.  It defines associations by cross-
8    reference to another part, as including trusts that exist
9    under a written agreement.  So, we think it's black and white
10   and since --
11             THE COURT:  All right, so that's one.
12             MR. SCHLANGER: Yeah.
13             THE COURT:  They didn't register.  Next.
14             MR. SCHLANGER:  Next.
15             THE COURT:  But if they registered, they could.
16             MR. SCHLANGER:  If they registered, then they could
17   have.  So --
18             THE COURT:  Okay, go ahead.  What's next?
19             MR. SCHLANGER:  The next issue is that the state
20   court complaints -- and we're talking about the universe of
21   complaints is, as disclosed by defendant is 3,370 complaints
22   of which 807 -- 890, according to defendant were filed within
23   one year of filing, which covers them under the FTPA and then
24   the rest, the other couple of thousand, are covered under the
25   New York General Business Law (indiscern.).  So the state

```
                                                          5
1    court pleadings allege that the National Collegiate Trust is
2    an original creditor, we believe that's false.  It's
3    undisputed that they are an assignee, they're not an original
4    creditor.
5             THE COURT:  Who is the original creditor?
6             MR. SCHLANGER:  So in this case, it was a student
7    loan, I think it was B of A.
8             MR. FJERMEDAL:  Yes.
9             THE COURT:  Okay.  What do you say to that?
10            MR. FJERMEDAL:  Program lender, Your Honor, and
11   that --
12            THE COURT: Program what?
13            MR. FJERMEDAL:  That B of A is a program lender.  It
14   transferred and assigned all its right, ultimately, to NCSLT
15   Trust and that, at the time of charge-off is the operative
16   time they owned the debt and, therefore, were the original
17   creditor at --
18            THE COURT:  At the time of charge-off, who owned the
19   debt?
20            MR. FJERMEDAL:  NCSLT Trusts --
21            THE COURT:  Oh, Okay.
22            MR. FJERMEDAL:  2005-3.
23            MR. SCHLANGER:  So, I would just add, I think we can
24   narrow that dispute further --
25            THE COURT: Okay.
```

```
 1            MR. SCHLANGER:  -- which is, as I understand it,
 2   defendant's argument is that in October of 2014 there was a
 3   change to the court regulations that had to do with paperwork
 4   required when different types of things are filed for default
 5   judgments in consumer credit cases.  And, in October, the
 6   court set forth a really sort of unusual definition of
 7   original creditors.  And for purposes of these default
 8   requirements, original creditors shall mean, you know, what we
 9   all think of as original creditor and, in addition, assignees
10   -- assignees took title prior to default.  So, as I understand
11   it from papers and from talking to my adversary, that their
12   position is, "well since National Collegiate Trust would be an
13   original creditor under that definition, we win on that
14   point."  And I think there's two relevant points.  One is that
15   the regulations predate the pleading for the named plaintiff.
16   I mean, the named plaintiff's state court collection action
17   was in May of 2014.  It's undisputed that the regulations did
18   not got into effect until October of 2014.  The other point is
19   that the regulations are in the context of -- on their face --
20   are in the context of what paperwork needs to be included on a
21   default motion and in an initial complaint -- you know, that's
22   being received by the least sophisticated consumers, you know,
23   that's the standard under the ethic's of PA.  I think it would
24   be more than fair -- it would be correct so to say that the
25   average person hearing that the plaintiff in the lawsuit is an
```

1  original creditor understands it to mean what we all
2  understand when we say, "So I'm an original creditor."  And
3  the reason this matters, just to be clear, it matters for a
4  couple of reasons.  One is that, you know, if you don't know
5  that the plaintiff is an assignee, in a state court collection
6  action, then you wouldn't know whether to challenge the
7  standard.  Right?  In these cases, like in the mortgage cases,
8  standing has ended up being a really difficult problem for
9  many of the entities that are bringing these suits, because
10 they can't prove chain of title.  And so, if you misstate that
11 you're an original creditor, you're essentially fighting for
12 the consumer in court.  But there's no issue about that,
13 because there would be no assignment, because -- unoriginal
14 creditors.  So it's not, you know, sort of -- well, "why would
15 anybody care about that?"  Understanding whether or not the
16 plaintiff in a collection suit is the original creditor or an
17 assignee is important, as anyone who defends these suits would
18 tell you.
19         MR. FJERMEDAL:  We're citing to the New York Rules
20 that are applicable to all state courts in various levels.
21         THE COURT:  Okay.  And then what's your next point?
22 But if -- well, go ahead.
23         MR. SCHLANGER:  So, the third and final allegation
24 on which we are seeking relief, is that the complaints that
25 were filed by Forster and Garbus were signed by attorneys, but

```
 1   not meaningfully reviewed by attorneys prior to filing and
 2   that violates the --
 3           THE COURT:  And how do you know that?
 4           MR. SCHLANGER:  Well, we get discovery on it now,
 5   but, essentially --
 6           THE COURT:  Yeah, but when you allege it, you must
 7   have a basis?
 8           MR. SCHLANGER:  Sure.  Our allegation, because if
 9   you looked at the file you would know they weren't the
10   original creditor and you would know that the plaintiff's not
11   authorized to proceed and because the 3,300 complaints are
12   all, except for the amounts, essentially word-for-word
13   identical.  So --
14           THE COURT:  But isn't -- aren't they just based on
15   student loans, so why wouldn't they be identical?
16           MR. SCHLANGER:  There's nothing wrong with them
17   being identical if they're correct.  But it -- the combination
18   of the fact that they're all identical and that they all get
19   very basic facts that would be clear to anyone reviewing the
20   file, wrong.
21           THE COURT:  Like what?
22           MR. SCHLANGER:  Like whether or not this entity is
23   licensed in New York, whether or not --
24           THE COURT:  Well, no, but they say they are, so
25   they're not saying that, you know, that suggests that you have
```

1   different points of view on that.  They say they are licensed,
2   so that it's not wrong.  And so, when an attorney reviews it,
3   he goes, "Oh, well, we're licensed."  You know, why would they
4   draft a boilerplate letter if they didn't have, you know,
5   properly covered these bases.
6           MR. FJERMEDAL:  I think -- well, I think they're not
7   alleging that we checked any of this before we filed.  I mean,
8   these are the arguments that my opposing counsel has come up
9   with after --
10          THE COURT:  Well, we'll let him make that
11  connection --
12          MR. SCHLANGER:  As I understand -- there's no
13  allegation, as I understand in this case, by the defendants,
14  at least, so far, that actually we looked into each of these
15  issues prior to filing and we looked at each case file to make
16  sure that the original creditor that we
17  -- that our plaintiff was or wasn't the original creditor.  I
18  think they came up with a boilerplate complaint that they
19  applied blanket across 3,300 instances and we think that
20  raises --
21          THE COURT:  But they disagree with you about NCSLT
22  and they think NCSLT is a proper plaintiff.
23          MR. FJERMEDAL:  I -- Your Honor, I believe that the
24  first two issues are a derivative of, you know, they're the
25  two points in dispute.  The meaningful attorney review issue I

```
 1  believe pertains to those two particular issues.  Now, you go
 2  beyond that --
 3          THE COURT:  Right, which he -- but he acknowledges
 4  that.  Go ahead, so go ahead, he goes --
 5          MR. FJERMEDAL:  And I mean, you know, we do have all
 6  the documentation from the original loan, to the Tiller
 7  Disclosure, to the chain of title documentation because this
 8  is a very highly regulated arena in which you need all your
 9  back-up documentation.  And our position is that Ms. Winslow's
10  loan is verified and that we have all the proof necessary.
11          THE COURT:  And if you win on this motion, it's case
12  dispositive.  They're done.
13          MR. FJERMEDAL: Yes.
14          MR. SCHLANGER:  On all three points, sure.
15          MR. FJERMEDAL:  Meaning then they've lost summary
16  judgment on all points.
17          THE COURT:  All right, what about settlement.
18          MR. SCHLANGER:  So, we have repeatedly
19  approached –
20          THE COURT:  What are the damages here?
21          MR. SCHLANGER:  So, their -- this is a statutory
22  damages (indiscern.) --
23          THE COURT:  Right.
24          MR. SCHLANGER:  So, we're limited to one percent of
25  the aggregated net worth of the defendants.  There has been a
```

1   year and a half of dispute and discovery on what the net worth
2   of the defendants is.  They originally took the position that
3   their net worth is zero and it turns out there were a whole
4   bunch of related entities that they had organized and where
5   all of the assets or most of the
6   assets –
7              THE COURT:  Oh, that's right.  Yes, right.
8              MR. SCHLANGER:  -- of the business were located.  We
9   since had discovered, on -- in particular, you know, there's a
10  real estate trust that owns a very large office complex and
11  property and that -- and that the law firm pays, you know,
12  something like $1.5 Million a year in rents too.  But it's
13  controlled by the family -- it's controlled by the partners
14  and the families.  So, I think at this point, the main dispute
15  on that, we think the -- we think right now, having sort of
16  looked at it, the net worth is likely somewhere in the sort of
17  6 millionish range.
18             THE COURT:  Well, they're not going to pay at 1%.
19             MR. SCHLANGER:  And one percent of that would not be
20  a lot of money --
21             THE COURT:  Yes, right.
22             MR. SCHLANGER:  -- but their position is --
23             MR. FJERMEDAL:  Well it's less.  You know originally
24  we were looking at $4 or $5,000,000.  The financial condition
25  of this law firm -- due to the lack of consumer actions -- has

1    precipitously declined, along with the --
2              MR. SCHLANGER: (Indiscern.).
3              MR. FJERMEDAL:  It's not only you -- it's not only
4    your fault, it's also the debt buying clients that stopped
5    placing files.  So, what you have is you have a law firm with
6    a big piece of property that they bought in 2010 -- when they
7    were doing very well -- and they're under water and that
8    impacts their net worth.  That's one of the main areas --
9              THE COURT:  But if that's true, why does he want to
10   waste his time going forward with this case.
11             MR. SCHLANGER:  Well, I think one of the things Mr.
12   Fjermedal is saying -- so, first of all, we don't think they
13   produced much evidence in that set of assertions, and we
14   think, you know -- we've done an appraisal of the building.
15   We've deposed their expert.  We, you know, received a fair
16   amount of financial information from Mr. Forster and Mr.
17   Garbus, and Forster and Garbus and there's a related law firm
18   Forster --
19             MR. FJERMEDAL:  Forster Garbus -- Garbus --
20             Mr. SCHLANGER:  Forster Garbus and Garbus and
21   there's a related debt buying entity called the Forster Group,
22   and we think that when anchored, the real estate entity.  And
23   we think when you look at all of that, particularly, you know,
24   no matter how bad their business
25   is --

1          THE COURT:  There's something there.  Yes.
2          MR. SCHLANGER:  -- the building is worth a ton of
3    money.  So, but beyond that, I think the bigger issue might be
4    a legal issue, which is that what Mr. Fjermedal is saying is
5    that, you know, Tier 1 is closed, right, and we've done the
6    discovery.  But what he's saying is, you know, as -- since we
7    anticipate that, you know, business is bad and getting worse,
8    we only want to value it at what we think it will be at the
9    end of the litigation, not what discovery is showing it to be,
10   meaning, there's a difference of opinion and positions.
11         THE COURT:  Yes, but at the end of the day there's
12   got to be something there for you to execute a judgment
13   against, I mean, otherwise you're spinning your wheels.
14         MR. SCHLANGER: Sure.
15         THE COURT:  So –
16         MR. SCHLANGER:  And even if the law firms were to
17   dissolve, the related entity with holding this, you know,
18   245,000 square foot building  -- would be there.
19         THE COURT:  Okay.  Yes.  All right, so --
20         MR. SCHLANGER:  And they've got a 20-year lease from
21   the law firm, as well, which the law firm continues to pay.
22         THE COURT:  Okay.
23         MR. FJERMEDAL:  In which they're in two layers of
24   debt -- significant debt.
25         THE COURT:  So, basically, you decided to make an

1    application to make this motion now, because?

2             MR. FJERMEDAL:  Now, because, and we were discussing

3    this, as to whether we make the motions to stay fact discovery

4    pending in resolution of those motions, on these purely legal

5    issues.  I hadn't --

6             THE COURT:  Oh, you hadn't dealt with that before

7    Judge Shields?

8             MR. FJERMEDAL:  Well --

9             MR. SCHLANGER:  Well, we finished tier one --

10            THE COURT: Right.

11            MR. SCHLANGER:  We started tier two --

12            MR. FJERMEDAL:  Started tier two --

13            MR. SCHLANGER:  -- and I -- and plaintiff moved for

14   class certification because the Tier 1 dealt with, as far as

15   we are concerned, the only fact issues that were a barrier to

16   certification, which were how many people are in the class --

17   now we know and it's, you know, clearly one-fourth, right.

18   So, we're fine there, and then, net worth.  And now we have

19   net worth discovery and they're prepared to say and to

20   demonstrate that, you know, there's a reasonable basis to

21   think that there's a net worth here sufficient to proceed as a

22   class.

23            THE COURT:  Okay.  And so --

24            MR. FJERMEDAL:  One issue is the tier -- is the

25   class definition.  We believe it's 2005-3, in which they are

1  about a hundred suits per year.  Now, that meets the
2  numerosity standpoint, but I know, you've lumped in 2005-1,
3  -2, and -3 and I think that's one issue that we've had
4  problems with.
5          THE COURT:  Right.  But, you're moving on purely
6  legal issues --
7          MR. FJERMEDAL: Correct, yes.
8          THE COURT:  -- now, because?
9          MR. FJERMEDAL:  Because we believe that we have the
10 facts necessary to proceed, however, if we need to complete
11 Tier Two discovery, we'd be in a position at that point to
12 make the motion.
13         THE COURT:  But do you need to complete Tier Two
14 discovery to make this motion?  No.
15         MR. FJERMEDAL:  No.
16         THE COURT:  Right.  Yes.
17         MR. SCHLANGER: It's (indiscern.).
18         THE COURT:  No, that's what I mean.  So, this motion
19 -- we can tee this right up.
20         MR. SCHLANGER:  Yep.
21         THE COURT:  Okay, fine.  What do you have in mind
22 for a briefing schedule.
23         MR. FJERMEDAL: So, we could make the class cert.
24 motion certainly within thirty days wouldn't be a problem for
25 the plaintiff.  Can I flag one --

1                THE COURT:  Yes.
2                MR. FJERMEDAL:  -- issue though in saying that,
3     because currently the deadline for tier two discovery is
4     February 10th, I believe.  And one thing, I think maybe and
5     the parties agree on, in this case is that it might make sense
6     to stay that discovery while we tee up these two discreet
7     legal motions, because if we lose on summary judgment on legal
8     grounds, why do we need to do all this discovery?
9                THE COURT:  No, I agree.  Yes, right.  That's about
10    -- yes, that would seem to me the -- yes.
11               MR. FJERMEDAL:  I mean which -- I don't mean to say,
12    I think (indiscern.) --
13         (Laughter)
14               THE COURT:  No, no, I know.  I think you're -- no, I
15    was going to exactly go there, which is, you know, I don't
16    think it's necessary or prudent to spend money on something
17    when you're not sure.  Let me ask -- you've been before Judge
18    Shields since 2015, why didn't you consent to her for all
19    purposes for this case?
20               MR. SCHLANGER:  The issue hasn't -- since we
21    initially filed the -- you know, initial in the court room --
22    parties checked the box --
23               THE COURT:  Yes.
24               MR. SCHLANGER:  -- I don't think we've discussed it.
25    So --

```
 1        (Discussion - unrelated to the case)
 2            THE COURT:  So, I mean, I'm just saying because
 3   you've had such a history with her, you know, I'm probably
 4   going to refer the motion to her anyway, so --
 5            MR. FJERMEDAL:  So --
 6            THE COURT:  Do you want to consent to her?
 7            MR. FJERMEDAL:  I don't have a issue consenting to
 8   Judge Shields -- Magistrate Judge Shields, Your Honor,
 9   but --
10            MR. SCHLANGER:  I don't either.
11            THE COURT:  Okay, good.  There you go.
12        (Laughter)
13            THE COURT:  Okay.  Why don't I do this, let me give
14   you a briefing schedule anyway and I'm sure she'll be okay
15   with everything scheduled.  So why don't you tell me when you
16   want the briefing schedule to be.
17            MR. FJERMEDAL:  I would like a longer time period,
18   because actually I have reply papers due on the
19   (indiscern.) --
20            MR. SCHLANGER:  Case before you.
21        (Laughter)
22            THE COURT:  Oh, I am easy.  I'll probably give you
23   an adjournment.  But if you want -- well then if you don't
24   want plaintiff's counsel to move until March 6th, I'll do
25   March 6th.  But, I mean, it's going be -- I'm gonna -- I'm
```

Case 2:15-cv-02996-AYS   Document 54   Filed 03/20/17   Page 18 of 19 PageID #: 207

                                                                  18

```
 1    sure it'll be fine with Judge Shields and then you would put a
 2    reply in, I would say, in a month, which would give you --
 3    March 6th, April 7th, and then April 21st.  And then, what
 4    I'll do is I'll put the consent in and I'll indicate -- I'll
 5    let her know that this is the briefing schedule that was
 6    agreeable if she wants to change it, she can change it -- but
 7    I doubt that she will.
 8             MR. FJERMEDAL:  Can Your Honor put a stay on
 9    discovery?
10             THE COURT:  Yes. Oh, yes.
11             MR. FJERMEDAL:  Okay.
12             THE COURT:  Okay.  March 6th, April 7th, April 21st,
13    discovery stayed pending disposition of the motion, both sides
14    consent to Judge Shields -- who's wonderful and, especially
15    since I don't play squash anymore.
16        (Laughter)
17             MR. FJERMEDAL:  Your Honor, just so that scheduling
18    is for plaintiff's class certification?
19             THE COURT:  Yes. Yes.
20             MR. FJERMEDAL:  So what happened with defendant's
21    summary judgment motion?
22             THE COURT:  Oh, why?  Do you want to make it
23    just --
24             MR. FJERMEDAL:  We're going to be --
25             THE COURT:  Cross moving?
```

                                                                    19

1            MR. FJERMEDAL:   Cross moving.

2            MR. SCHLANGER:   So you're,

3            MR. FJERMEDAL:   So --

4            MR. SCHLANGER:   You're opposition.  So you're going

5    to file a cross motion with your opposition -- on the same

6    date as your opposition you're filing a cross motion?

7            THE COURT:   Well, you can either do that.  I think

8    he's going to do it on March 6th.

9            MR. SCHLANGER:   March 6th.

10           MR. FJERMEDAL:   Fine.  So this is for what -- I'm

11   sorry --

12           THE COURT:   That's okay.  Okay folks, thank you.

13           MR. SCHLANGER:   Thank you.

14           MR. FJERMEDAL:   Thank you.

15       (Court adjourned)

16

17                       CERTIFICATION
18   I certify that the foregoing is a correct transcript from the
19   electronic sound recording of the proceedings in the above-
20   entitled matter.
21
22
23   *Lewis Parham*                              3/16/17
24
25   _____          _____
26   Signature of Transcriber                    Date